NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

In re the Matter of:

AMY ESPINOZA, *Petitioner/Appellant*,

*v.*

MICHAEL ESPINOZA, *Respondent/Appellee*.

No. 1 CA-CV 18-0239 FC
FILED 3-28-2019

Appeal from the Superior Court in Maricopa County
No. FC2010-091589
The Honorable Kristin Culbertson, Judge

**AFFIRMED IN PART; REVERSED IN PART**

COUNSEL

Alongi Law Firm, PLLC, Phoenix
By Thomas P. Alongi
*Counsel for Petitioner/Appellant*

Michael Espinoza, Overgaard
*Respondent/Appellee*

---

**MEMORANDUM DECISION**

Presiding Judge Lawrence F. Winthrop delivered the decision of the Court, in which Judge Maria Elena Cruz and Judge Kenton D. Jones joined.

---

**W I N T H R O P**, Judge:

¶1          Amy Espinoza ("Mother") appeals the family court's order (1) reinstituting parenting time for Michael Espinoza ("Father") of their minor child, J.E; (2) not requiring Father to participate in therapeutic intervention; and (3) denying Mother's request for reimbursement of legal expenses.  For the following reasons, we reverse the family court's order only as to its modification of parenting time; we affirm the remainder of the order.

**FACTS AND PROCEDURAL HISTORY**

¶2          Mother and Father are a divorced couple with three children in common, one of whom—J.E.—is the focus of this appeal.  In July 2015, because of his permanent relocation to Show Low, Father, through counsel, petitioned the court for a modification of legal decision-making and parenting time, requesting to be designated J.E.'s primary residential parent, and to share joint legal decision-making with Mother.  At the time Father filed the petition, he and Mother shared equal parenting time.

¶3          Between the time Father filed his petition and the eventual date of the hearing in February 2018, the relationship between Mother and Father deteriorated significantly.  In late 2016, Father took J.E. and kept him for roughly one month, claiming that J.E. refused to return to Mother out of fear; eventually, the court ordered J.E.'s return.  The court ultimately suspended Father's parenting time until further order.

¶4          Despite the order suspending his parenting time, Father shortly thereafter picked up J.E. at his school in Queen Creek and drove him back to Father's house in Show Low.  Father initially maintained, however, that J.E. had hitchhiked from Queen Creek to his house in Show Low.  Mother notified police of J.E.'s whereabouts and the court order suspending Father's parenting time; once police retrieved J.E. from Father's, J.E. was forced to stay the night in a juvenile detention facility.  J.E. eventually admitted to his therapist that he had not hitchhiked to

Father's, but that Father had picked him up from school and instructed J.E. to maintain the hitchhiking story.

¶5        The record reflects myriad other instances of Father's uncooperativeness and refusal to adhere to court orders, as detailed in Section II of this decision.  Finally, after a number of delays, a hearing on Father's petition to modify, and on other issues raised by Mother,[1] was scheduled for February 2018.  Father failed to appear at a pretrial conference the week before, claiming at the hearing that "it just flew by" him.  At the opening of the hearing, the court granted Father's motion to withdraw his petition to modify parenting time, but denied his motion to vacate the hearing and proceeded to hear Mother's issues.  Mother, represented by counsel, presented multiple documents and other evidence, her own testimony, and the testimony of J.E.'s therapist, Georgia Nelson; Father appeared *pro per* and provided his own testimony, but offered no other witnesses or documentary evidence.

¶6        After the hearing the family court ordered that Father's parenting time be reinstated on a limited basis, and did not require Father to resume participating in a therapeutic intervention program.  Per the agreement of the parties, the court granted sole legal-decision making authority to Mother, but denied her request for fees and costs.  Mother timely appealed.  We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") section 12-120.21(A)(1).

**ANALYSIS**

I.        *Father's Failure to File an Answering Brief*

¶7        We granted Father's initial motion to extend the filing deadline of his answering brief and provided an additional thirty days for him to do so.  Notwithstanding that extension, Father failed to file his brief, and requested additional time.  There was no good cause shown to again extend the deadline, and we deemed this matter submitted on Mother's brief and the lower court's record on appeal.  When the respondent party

---

[1]        Father's attorney had acquiesced to receiving Mother's counterclaims in a letter.  The January 2017 letter contained "a request to erase [Mother's] normal duty of consultation with [Father] for legal decision-making, and also suspend [Father's] parenting time until it is clear from [J.E.'s] therapist's reports, [and] any other relevant evidence, that a program of therapeutic reunification . . . will cause more good than harm."

fails to file an answering brief, this court ordinarily has discretion to consider such failure as a concession of error. *See* ARCAP 15(a)(2); *Gonzales v. Gonzales*, 134 Ariz. 437, 437 (App. 1982). However, we decline to do so here where the best interests of a child are at stake. *See Hoffman v. Hoffman*, 4 Ariz. App. 83, 85 (1966) (discussing the obsolete but analogous Rule of the Supreme Court 7(a)(2)).

> II. *Whether the Family Court Abused Its Discretion by Reinstating Father's Parenting Time*
>
> A. *Best-Interests Findings*

¶8 Mother alleges the family court erred when it reinstated Father's parenting time. We review a family court's order on a petition to modify parenting time for abuse of discretion. *Christopher K. v. Markaa S.*, 233 Ariz. 297, 300, ¶ 15 (App. 2013) (citation omitted). On appeal, we will not overturn a court's order simply because we find evidence in conflict with the result. *Hurd v. Hurd*, 223 Ariz. 48, 52, ¶ 16 (App. 2009) (citation omitted). We look instead to whether the court's decision is supported by substantial evidence. *Id.*

¶9 Mother concedes that Arizona's stated public policy favors "substantial, frequent, meaningful and continuing parenting time," but argues that the family court ignored the statutory exception to that public policy where there is evidence that such parenting time is contrary to the child's best interests. Mother contends that, although the court made the requisite statutory findings in its order, it failed to adequately state the "*reasons* for which the decision [to reinstate parenting time] is in the best interests of the child." A.R.S. § 25-403(B) (emphasis added). In essence, Mother argues that those findings are not supported by substantial evidence and must be set aside.

¶10 Our legislature has stated that:

> It . . . is the declared public policy of [Arizona] and the general purpose of this title that absent evidence to the contrary, it is in a child's best interest:
>
> (1) To have substantial, frequent, meaningful and continuing parenting time with both parents[; and]
>
> (2) To have both parents participate in decision-making about the child.

A.R.S. § 25-103(B). Father, as the parent not granted legal decision-making, "is entitled to reasonable parenting time to ensure that [J.E.] has substantial, frequent, meaningful and continuing contact with [Father] unless the court finds, after a hearing, that parenting time would endanger [J.E.'s] physical, mental, moral or emotional health." A.R.S. § 25-403.01(D).

¶11 In its best-interests findings, the family court noted that "[b]oth parents appear to be bonded with [J.E.]"; J.E. is close with both Mother's and Father's significant others; J.E. "likes being with his stepsisters when he visits Father, and is close with his stepmother"; J.E. "stated that he preferred to live with Father"; and Father presented no issues of mental or physical health, or of abuse of drugs or alcohol. Although the family court did not necessarily misstate this evidence, we conclude that the court, as a matter of law, did not make adequate "specific findings on the record about *all relevant factors* and the reasons for which the decision is in the best interests of the child." A.R.S. § 25-403(B) (emphasis added). Specifically, the record creates concern as to whether Father's behavior might "endanger [J.E.'s] physical, mental, moral or emotional health." A.R.S. § 25-403.01(D). Absent any clear findings addressing A.R.S. § 25-403.01(D), we cannot affirm the court's order.

¶12 The record is replete with evidence relevant to an A.R.S. § 25-403.01(D) analysis. Shortly after asking the court during a 2016 hearing about his options if J.E. ever refused on a scheduled exchange to return to Mother, Father told Mother he would not meet for an exchange, claiming that J.E. did not wish to go back to her house out of fear. Mother filed an emergency motion to suspend Father's parenting time; the court denied the motion, but ordered that Father return J.E. to Mother. The parties met in Mesa—third parties and police were present. However, J.E. refused to get out of Father's car; accordingly, Father was unable to comply with the court's order. Mother thereafter renewed her emergency motion to modify parenting time. This time, the court granted the motion in a September 2016 order suspending Father's parenting time "pending further written order by [the] court," and appointing a Best Interest Attorney ("BIA")[2] for J.E.

¶13 Ultimately, Father's unauthorized and unilateral taking of J.E. lasted roughly one month. During that one-month period, Father enrolled J.E. in the Heber-Overgaard Unified School District, falsely checking the

---

[2] The services of the BIA were initially short-lived. Father refused to cooperate with and pay him; accordingly, in January 2017 the BIA was allowed to withdraw upon his own motion. The BIA was later reappointed by the court in April 2017.

box on the enrollment form indicating he had legal decision-making authority as to J.E. Additionally, Father listed his second wife as J.E.'s stepmother and omitted any mention of Mother whatsoever.

¶14 Just over a month after the court's 2016 order suspending his parenting time, Father retrieved J.E. from school, took him back to Show Low, and then emailed Mother that J.E. "hitched a ride . . . with a complete stranger" and was in Show Low when Father arrived home from work. Father claimed that J.E. stated that Mother, her boyfriend, and her boyfriend's children "are tag teaming [J.E.] and telling him how evil of a person" Father is, that Mother "put his life in danger," and that J.E. told him that the risk of hitchhiking with a stranger "was worth it." Father finally expressed apparent incredulity that "such a danger was worth it compared to being at [Mother's] household." Relying on the fabricated hitchhiking story, Father even filed an emergency motion with the court to grant him sole legal decision-making and deny Mother parenting time; he further stated in the motion that J.E. claimed he fled Mother because she frequently told him she would "make sure [Father] is sent to prison and [J.E.] is never going to see [Father] again."

¶15 J.E.'s therapist, Georgia Nelson, wrote in a report that J.E. initially maintained the truthfulness of this story; however, the next week J.E. told Nelson "that he did not run away and that [Father] had picked him up and . . . told him to say that he had hitchhiked." Review of security footage from J.E.'s school confirmed that Father had actually travelled the 100 miles — there was no hitchhiking on J.E.'s part — and was present at J.E.'s school that day. As a result of his initial adherence to Father's hitchhiking lie, J.E. was forced by police to spend a night in a juvenile detention facility.

¶16 During the pendency of this matter, Father regularly maligned and threatened Mother's counsel. In an email to Mother regarding Father's unauthorized one-month custody of J.E., Father referred to Mother's counsel as "that spineless gutless unethical weasel of an attorney." In a separate email to counsel, Father called him a "piece of [expletive]," an "unethical hack," and said that soon everyone in the legislature and legal community would "know what a sorry unethical piece of crap you are." When counsel sent Father a letter outlining Mother's positions on various issues and pleading with Father to cooperate with the BIA, Father replied in an email: "Stick it in you[r] [expletive] you unethical piece of [expletive]." At the hearing resulting in the order currently on appeal, the record reflects that Father even lunged at counsel during cross-examination.

¶17 Other instances highlight Father's deliberate disregard for court orders. After Father alleged car trouble and told Mother where she could pick up J.E. one day in May 2015, Mother responded that they were supposed to meet at one of two court-sanctioned locations. Father replied that he would go to neither and told Mother to "[c]all the cops, document, notify the court if you want. I told you where I'll be. That's it." This is only one example on the record of Father's conscious and continuing disregard of court orders regarding communication and meeting locations. In May 2014, Father posted to an online forum: "I have learned that since there are no punitive measures I dont [sic] have to do what the court says anyway. I will never be submisive [sic]." Additionally, Mother testified to and trial exhibits reflect Father's consistent use of text messaging to communicate with Mother, in violation of the court's order that all communication between the parties be via email, and various instances where Father insisted on exchanging J.E. at unapproved locations.

¶18 In an apparent attempt to create documentation supporting modification of parenting time and modification of legal decision-making, Father berated Mother in an email for not getting J.E. proper medical care when he broke his arm, writing:

> I finally was able to get him a cast like I told you I was going to. For heaven's sake he has a broken arm. . . . I will no longer send my children into harms [sic] way. You need to grow up. Our children deserve better than this. Same goes with your counsel.

Mother presented testimony and photographic evidence that she did in fact provide J.E. with medical care and acted in accordance with instructions provided by medical professionals who assessed J.E.'s arm.

¶19 At the time of the February 2018 hearing, J.E. had been seeing his therapist, Ms. Nelson, for over a year. In a report filed to the court, Ms. Nelson stated that J.E. indicated he missed Father and "expressed the desire that [Father] obey the rules and quit trying to cause trouble so he can go to [Father's] house again." J.E. had two years prior expressed a similar wish in an interview conducted as part of a June 2016 parenting conference, when he stated that he preferred to live with Father; but as the court noted in its best-interest findings, the interviewer noticed that J.E. had recorded the interview, presumably at the direction of a parent.

¶20        J.E.'s expressed wishes notwithstanding, when the BIA asked Ms. Nelson at the hearing whether she recommended Father regain parenting time, she testified:

> At this time, because I feel like nothing has been resolved, or issues with [Father] and [J.E.] have not been adequately worked on, I would suggest [they] continue not to have contact.

The BIA stated his position was the same: "that Father's parenting time be suspended" pending some marked success in therapeutic intervention. Ms. Nelson further testified that J.E. "express[es] anxiety and stress whenever the subject of going to visit with [Father] comes up or [he is] aware of any court dates," and testified to the "trauma and emotional trauma" J.E. felt he suffered when he would go to Father's house—a factor directly relevant to an A.R.S. § 25-403.01(D) analysis. In her report, Ms. Nelson indicated that she was "extremely concerned" about the emotional impact that the fabricated hitchhiking event has had on J.E., and stated her concern that J.E. was being used by Father as a weapon against Mother. Ms. Nelson reported that J.E. "appears to be adjusting well" since taking permanent residence with Mother, where he reported feeling safe, less stressed, and less anxious. Finally, she testified that she had never felt Mother pressured or coerced J.E. to say or retract certain things during therapy.

¶21        On review of the family court's order, the court's best-interest findings inadequately addressed Father's myriad issues, misbehavior, lack of candor, and, most importantly, the best interests of J.E. *See* A.R.S. § 25-403(B) ("In a contested . . . parenting time case, the court shall make specific findings on the record *about all relevant factors* and the reasons for which the decision is in the best interests of the child.") (emphasis added); A.R.S. § 25-403.01 (addressing whether "parenting time would endanger the child's physical, mental, moral or emotional health"). In addition to the issues detailed throughout this decision, the court's order is silent as to Father's expressed antipathy for participating in these proceedings and Father's own recommendation to the court that it be "left up to the responsibility of any psychologist or counselor" when he could safely resume parenting time. In light of that, combined with the evidence indicating Father's inability to effectively parent and abide by previous court orders, the court's findings are not supported by substantial evidence and are inadequate as a matter of law. *See Downs v. Sheffler*, 206 Ariz. 496, 501, ¶ 19 (App. 2003). Accordingly, we reverse the family court's order modifying parenting time.

### B. Therapeutic Intervention

**¶22** Father unilaterally stopped participating in therapeutic intervention, citing his alleged inability to pay. This justification is documented in a December 2017 report filed with the court by the therapeutic interventionist. The court directed Father to file a financial affidavit in January 2017, which he did not provide until August 2017. As justification for his untimely compliance, Father stated to the court that he "didn't have anything to file" before then because he "was just getting started working." Father further admitted that he had not filed a tax return since 2008.

**¶23** The record supporting Father's avowed inability to pay for the court-ordered therapy seems lacking; however, the family court has substantial discretion in considering this issue and making its finding. We do note, however, that both the BIA and Ms. Nelson have opined that Father should not have parenting time restored unless and until he resumes participating in the recommended therapy. And, as noted above, Father agreed in open court that any decision as to when he should resume parenting time should abide by the opinion of the treating psychologist or counselor.

**¶24** We affirm the court's exercise of discretion to accept Father's representation as to his financial ability, but also direct the family court in any further proceedings to consider Father's deferral to a treating therapist or psychologist as to whether it is in J.E.'s best interests to allow resumption of parenting time in the absence of concurrent participation in therapy.

### III. Mother's Legal Expenses

### A. Expenses Incurred Before Appeal

**¶25** Mother argues that the family court erred by not ordering Father to pay legal expenses incurred by Mother. Section 25-324 governs the allocation of fees and costs in family law disputes:

> The court from time to time, after considering the financial resources of both parties and the reasonableness of the positions each party has taken throughout the proceedings, may order a party to pay a reasonable amount to the other party for the costs and expenses of maintaining or defending any proceeding under this chapter . . . .

A.R.S. § 25-324(A). The statute is purely discretionary: the court "*may* order a party to pay" fees. (Emphasis added.) The statute only requires that "[o]n request of a party or another court of competent jurisdiction, the court *shall* make specific findings concerning" any award it makes or does not make. *Id.* (emphasis added). Because the record reflects no such request for findings, the court's summary denial of Mother's fees request was sufficient to comply with § 25-324(A). On this record, particularly as it relates to the fact that Father's conduct unnecessarily caused or expanded the need for judicial proceedings, we might have reached a different conclusion, *see* A.R.S. § 25-324(A) and (B); regardless, we defer to the family court's exercise of its discretion.

### B. *Expenses on Appeal*

**¶26** Mother also requests her fees and costs on appeal. Section 25-324(C) allows the recovery of costs and attorneys' fees on appeal. In the exercise of our discretion, we award Mother her taxable costs and reasonable attorneys' fees upon compliance with ARCAP 21.

### CONCLUSION

**¶27** We reverse the family court's order as to its modification of parenting time, and affirm the remainder of the order. We award Mother her fees and costs on appeal upon compliance with ARCAP 21.



AMY M. WOOD • Clerk of the Court
FILED:  AA